

W. J. Jones, McArthur, for plaintiff in error.

C. O. Chapman, Prosecuting Attorney, McArthur, and Louis M. Day, Chillicothe, for defendant in error.

BLOSSER, J.

The evidence discloses that a number of persons, including the defendant and the deceased Forest Camp, had attended church on the day of the homicide. The defendant claimed that before going to church he procured a revolver and took it with him on this occasion because he had heard that some of the boys whom he expected to see at church were going to run him back. The defendant and Lyman Camp, a cripple and a nephew of the deceased, with others were going along the road some distance from the church when a quarrel began and the defendant kicked Lyman Camp and a fight ensued at the roadside. After kicking Lyman Camp the defendant took hold of him and at that time Sylvia Camp, a sister of Lyman, screamed that Thacker was killing her brother. At that time Forest Camp came along in his automobile and stopped his car. The defendant stated that if Forest Camp got out of the car he would shoot him. While the defendant had hold of Lyman the deceased struck the defendant over the head with an automobile pump. At that time the defendant drew his revolver and shot Forest Camp, the bullet entering his mouth and inflicting a wound from which he died a few days later. Immediately after the shooting the deceased ran from the scene and sought a doctor. The defendant stepped in front of the automobile and stated "If anybody else wanted it he would give it to them, too." It is also in evidence that the defendant stated that "He shot the son of a bitch right in the face."

The trial court in reviewing this evidence no doubt concluded that the defendant did not act in self-defense but that on the contrary he went to church that evening seeking trouble and armed with a deadly weapon. The defendant had stated that while some of the other boys had been run back they could not run him. He provoked a fight with Lyman Camp and was so engaged at the time the deceased struck him. The defendant did not attempt to avoid a fight or to go away from the scene of the trouble. On the contrary, all of his conduct indicates that he was looking for trouble.

The finding of the trial court is amply supported by the evidence. The judgment of conviction is not contrary to law and is affirmed.

The trial court fixed a definite minimum sentence of eight years in the penitentiary. This was not authorized by law. §2166 GC as amended 114 O. L. 188, 189, provides that sentence shall not be fixed or limited in duration.

The judgment of conviction is affirmed but the case is remanded to the Court of Common Pleas for re-sentence according to law.

MAUCK, PJ, and MIDDLETON, J, concur.

## LAMIA v CLEVELAND (city)

Ohio Appeals, 8th Dist, Cuyahoga Co

No 12307.  Decided June 20, 1932

Bernard J. Smolin, Cleveland, for plaintiff in error.

W. George Kerr, Cleveland, and Frank M. Surtz, Cleveland, for defendant in error.

VICKERY, J.

It is claimed that this judgment should be reversed on the authority of the case of **Nick Nicholas v City of Cleveland, 125 Oh St 474**, which was recently decided by the Supreme Court. Perhaps that contention may be right, but the majority of the court think that this case is easily distinguishable from the Nicholas case, for the Supreme Court in its opinion in that case says that it is conceded that there was no trafficking in liquor or anything that indicated a trafficking in that case which would imply that had there been a trafficking in liquor, they perhaps might have followed the rule laid down in many cases decided by them to which we will allude hereafter.

It is clear from the record of the instant case that there was a trafficking in liquor as the evidence shows that the place had been watched, and people going in sober and coming out intoxicated gave an indication that liquor was being sold inside the building. A search warrant was procured and an entrance made. Several men were seen sitting around the table drinking both whisky and beer, and the owner of the property dumped a lot of liquor in the sink near by, whereupon an officer saved enough of the liquor thus dumped to indicate that it was intoxicating liquor, which upon an-alysis showed that it was contraband.

The record also shows that twenty-two bottles of beer were found in the ice box and 154 bottles in another place, all contraband. Upon interrogating the visitors sitting around the table drinking liquor, it was ascertained that they came in to buy, but they refused to reveal the price they paid for the liquor.

Now we think that this evidence clearly shows that there was a trafficking in liquor in the instant case, and the majority of the court wonders whether the Supreme Court intended, by its decision in the Nicholas case, supra, to overrule its former decisions such as in the case of **City of Cleveland v Nagle, 124 Oh St 14**, decided by the Supreme Court in June, 1931, in which it reversed the judgment of the majority of this court, even though no search warrant had been obtained at all, holding in effect that where there was a trafficking in liquor in what would otherwise be a private home, such trafficking had the effect of destroying the character of such home and made it a place of business, and the place could be searched and liquor obtained without a search warrant; and the majority of the court wonders whether the Supreme Court meant to overrule or nullify the Miller Law, §§6212-13 to 43 GC, which in effect provides that where there is a trafficking in liquor in a private home, it loses its character of a private home.

The majority of this court believes that all the Supreme Court intended to decide in the Nicholas case, supra, was that since the amendment to the Code, the issuing of a search warrant was a judicial and not a ministerial act; that inasmuch as in that case it was admitted that there was no trafficking and the search warrant had been obtained from the clerk of the court rather than from the judge, the search warrant was illegal; and that the liquor thus obtained could not be used in evidence. But, as already stated, the Supreme Court was careful to state in the Nicholas case that it was admitted there was no trafficking in liquor. So the majority of the court understands that decision to mean, and only to mean, that where a search warrant is necessary and is issued, it must be issued by a judge or magistrate of the court and not by the clerk of the court; that while the court adhered to its ruling in **Rosanski v State, 106 Oh St 442**, and still stood by the law announced in that case as to contraband seized in a place no longer a bona fide private dwelling because of traffic in liquor therein, it held that, since the law had been amended so as to make the issuance of a

search warrant a judicial act rather than a ministerial act, while not overruling the Rosanski case, supra, the rule in the Nicholas case must be different; that because there was no trafficking in liquor which would warrant the entrance of the home without a search warrant and the search warrant having been issued illegally, the motion to suppress the evidence should have been granted.

Now the majority of the court accedes to this doctrine, but we do not think that the Supreme Court meant to go to the extent that, where no such warrant was necessary and liquor was found and there was showing that trafficking was being carried on, even though the search warrant was issued illegally, it meant to nullify or repeal the Miller Act and to destroy the effect of the opinion of the Supreme Court in the case of **Porello v State of Ohio, 121 Oh St 280,** or the case of **City of Cleveland v Nagle, 124 Oh St 14;** or the case of **Rosanski v State, 106 Oh St 442,** and many others of like import sustained by the Supreme Court.

In the Rosanski case, supra,—and it is important to bear it in mind, for the court in the Nicholas case infer that with the exception of the part which deals with that feature of search warrant issuance as above outlined, they stand by the decision made in the Rosanski case,—the fourth and fifth syllabi read as follows:

"In prosecutions for violations of the prohibition laws of Ohio, where the charge involves unlawful possession of intoxicating liquors, a seizure of any contraband property by an officer, whether the seizure has been made under process unlawfully procured or without any process, will not void the seizure, nor authorize an order by a magistrate for a return of such contraband to the person from whose possession the same was taken, unless the seizure was made in a **bona fide** private dwelling.

"In such case all such contraband so seized is admissible in evidence upon the part of the state, and collateral inquiry for the purpose of determining its competency may not be made into the manner of its seizure."

We understand from the words of the Supreme Court in the Nicholas case that this still remains the law in accordance with their former decisions.

With this in mind, it must be remembered that the Miller law provides that where there is a trafficking in intoxicating liquors in a dwelling house, it thereby loses its character as a bona fide residence, and that

the same can be searched without a search warrant; and not believing that the Supreme Court intended to destroy the effect of the Miller law, and not believing that they intended to overrule their former opinions upon this question, the majority of the court can only conclude that the Supreme Court limited its decision in the Nicholas case to what was actually before it; and it being conceded in that case that there was no trafficking in liquor of any kind, nor anything which would give rise to an implication that there was a trafficking in liquor, the only question before the court was: Did the clerk of the Municipal Court, upon the evidence that was produced before him, have the power to issue a search warrant which power did exist prior to the amendment as outlined clearly in the Rosanski case? Since the law has been amended making the issuance of a search warrant a judicial rather than a ministerial act, the court could do no different than it did do in holding that the liquor was improperly seized, because it was conceded that the home was a bona fide home that had not been transformed by reason of a trafficking in liquor in said home.

The majority of this court thinks, from a fair reading of the decision of the Supreme Court in the Nicholas case and their reservations, still standing by the law laid down in the Rosanski case, that in the instant case there being an obviously clear violation of the law, for there was unquestionably a trafficking in liquor in the home, it had ceased to have the sacredness of a private dwelling and, therefore, it was not immune from search without search warrant. Surely, the mere fact that a search warrant was issued illegally when none was required to make the search, the mere issuance of a search warrant, though by ministerial officer, would not make the search of the house illegal, for the issuance of the search warrant was unnecessary and, therefore was unimportant and, therefore, did not and should not control the decision of the court in rendering its judgment. See Rosanski case, supra.

The majority of the court being firmly of the opinion that this was the clear import and intention of the Supreme Court in the Nicholas case, and being able to distinguish this case clearly from that case, thinks that the record shows there was clearly a trafficking in liquor in the instant case, and that the affidavit charging the defendant with the possession of liquor being other than the search warrant affidavit, the Municipal Court had ample authority to render the judgment that it did render upon

the evidence in this case. With these views we can see no error in the record and, therefore, we can do no other than to affirm the judgment of the Municipal Court.

WEYGANDT, J, concurs in judgment.
LEVINE, PJ, dissents.

## STEELE et v SEGAL

Ohio Appeals, 4th Dist, Ross Co

Decided May 26, 1932

Edwin D. Ricketts, Logan, and John P. Phillips, Jr., Chillicothe, for plaintiffs.
J. D. Withgott, Chillicothe, and John A. Poland, Chillicothe, for defendants.

MAUCK, PJ.

There is no question that the plaintiffs and defendant owned the number of shares of stock claimed and that they had talked among themselves with reference to the sale of the same as a whole, and the two plaintiffs testify that Segal acted as their agent in the negotiations and sale. The claim that Segal was acting for the plaintiffs in consummating the deal that was eventually made is clearly not supported by the evidence. The only substantial fact supporting the testimony of the plaintiffs in that behalf is the contract of sale signed by Segal and Hitchcock, which, without explanation supports the view that Segal was acting for the plaintiffs and actually agreed to deliver to Hitchcock both his own and the plaintiffs' stock. While these are the express terms of the contract signed by Segal all the witnesses that had knowledge of the circumstances unite in giving an adequate explanation of the particular form that the contract took, and the contract as so explained is entirely consistent with the testimony of all of the defendant's witnesses, who unite in saying that Segal did not in fact act for the plaintiffs in consummating the deal.

The defendant's position in this controversy is strongly supported by the testimony of the plaintiff Tulleys. Tulleys testifies that Segal actually obtained a contract by which all of the parties were to receive $700 per share for their stock, but the sale was upon deferred payments and accompanied by so many and such complicated conditions that the plaintiffs refused to join in consummating the sale. He further testifies that at the time he received the check from Mr. Poland for his stock he was informed that Segal was dealing with the purchaser on his own account and was receiving from the purchaser some different consideration from that being paid to himself and Steele. He at that time made no question of Segal's right so to deal and with that knowledge accepted the check.

For the reason, therefore, that the plaintiffs have not shown any confidential relations existing between them and Segal, and for the further reason that they consummated the deal with knowledge that Segal was acting for himself and receiving a dif-